IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PAULA THOMAS, as administrator of
the estate of Tory Brown,

    Plaintiff,

      v.

DAVID HIDALGO, in his individual
capacity,

    Defendant.

CIVIL ACTION FILE
NO. 1:23-CV-3700-TWT

**OPINION AND ORDER**

This is a civil rights action. It is before the Court on the Defendant David

Hidalgo's Motion for Summary Judgment, [Doc. 27], which is unopposed. For

the following reasons, the Defendant's Motion is GRANTED.

**I.  Background[1]**

This action arises out of an officer involved shooting that resulted in the

death of the Plaintiff Paula Thomas's son, Tory Brown. (Compl. at 1-2). On

August 23, 2021, Brown's grandmother called the Clayton County Sheriff's

Office ("CCSO") and reported that Brown was threatening to kill her

grandchildren. (Def.'s Statement of Material Facts ¶¶ 1, 3). A CCSO

Investigator, Sophal Vong, was advised that Brown had a probation violation

---

[1] The operative facts on the Motion for Summary Judgment are taken
from the Defendant's Statement of Undisputed Material Facts. The Court will
deem the parties' factual assertions, where supported by evidentiary citations,
admitted under Local Rule 56.1(B).

warrant out for his arrest, which his grandmother confirmed. (*Id.* ¶ 4). Investigator Vong was instructed to take Brown into custody. (*Id.* ¶ 5). When Brown's information was run through NCIC to verify the warrants, a caution message was returned advising: "Use Caution-Violent Tendencies." (*Id.* ¶¶ 6-7).

Investigator Vong spoke with Brown's grandmother again, who told him that she feared for her and her grandchildren's lives, that Brown always carried a firearm, and the location of the apartment that Brown was staying at. (*Id.* ¶¶ 8-10). Investigator Vong passed all of this information to the CCSO Fugitive Unit. (*Id.* ¶ 11). Defendant Sergeant David Hidalgo was assigned to the Fugitive Unit and was tasked with taking Brown into custody. (*Id.* ¶ 12). On the day of the incident, Brown's grandmother informed Investigator Vong that Brown had returned to the apartment complex in question and was at his girlfriend's apartment there. (*Id.* ¶ 15). Brown's grandmother told Investigator Vong again that she was extremely fearful of Brown's threats and was concerned that he had a firearm. (*Id.* ¶ 16). Upon meeting with the Fugitive Unit, Investigator Vong explained that Brown was wanted on a probation violation warrant for felony theft, had been threatening to kill his family members, was known to obstruct law enforcement, and was believed to be armed and dangerous. (*Id.* ¶¶ 17-18). During the meeting, the Fugitive Unit, including the Defendant, was informed of a previous incident involving Brown

where an officer was injured. (*Id.* ¶ 19). The Fugitive Unit made a plan to conduct a "knock and announce" after establishing a perimeter in case Brown attempted to flee. (*Id.* ¶ 20).

The Fugitive Unit eventually arrived at the apartment where Brown was purportedly staying and took their positions. (*Id.* ¶¶ 22-24). The Unit members were each wearing gear that said "Sheriff" on the front and back with their badges visible. (*Id.* ¶ 22). The Defendant approached the apartment door with Investigator Vong and two other Investigators—Kelly and Ahmad. (*Id.* ¶ 25). The Defendant knocked on the door with his left hand while pointing his rifle at the ground with his right hand. (*Id.* ¶ 26). While knocking, the Defendant announced the officers' presence by stating "Clayton County Sheriff's Office, come to the door." (*Id.* ¶ 27). Another officer said "[l]et me see your hands. Come out with your hands up. Clayton County Sheriff's Office, we have a warrant." (*Id.*). Similar verbal commands were given for ten to fifteen minutes. (*Id.* ¶ 28). A female opened the door and exited the apartment, along with another female and a child. (*Id.* ¶¶ 30-32). When asked, one of the females reported that Brown had a weapon inside the apartment. (*Id.* ¶ 35).

The Defendant was positioned on the left side of the door, allowing him to see to the right of the door, the living room, the kitchen, and the attached dining room. (*Id.* ¶¶ 36, 38). The lights inside of the apartment were not on, so the officers activated their weapon-mounted lights. (*Id.* ¶ 37). Eventually, the

Defendant saw a black male peek around the corner of the dining room wall. (*Id.* ¶ 42). The Defendant spoke to him, but the male did not respond before retreating out of sight. (*Id.* ¶ 44). Fugitive Unit members holding the perimeter advised that they could see Brown through the bedroom window and, after no response to the Defendant's repeated call outs, Brown was seen pacing back and forth between a back bedroom and the living room. (*Id.* ¶¶ 47-52). The Defendant then heard one of the members shout that Brown was rummaging through the bedroom closet looking for something. (*Id.* ¶ 53). Based on the length of time that the Fugitive Unit had been attempting to get Brown to surrender and knowledge that Brown had a firearm in the apartment, the Defendant was fearful that Brown was attempting to retrieve a firearm from the closet. (*Id.* ¶ 55).

Due to the Defendant's position in the doorway, he would not have been able to move in time to avoid any shots Brown might have fired, giving Brown an offensive advantage should he decide to shoot at the officers. (*Id.* ¶ 56). The Defendant called out to the perimeter officers and asked if they could see whether Brown had grabbed something, but they advised they could no longer see him. (*Id.* ¶¶ 57-58). The Defendant continued to call out to Brown, asking him to come out with his hands up. (*Id.* ¶ 59). The perimeter officers then advised that Brown was rummaging around in the closet again before advising that they had lost sight of him against. (*Id.* ¶¶ 61, 63).

4

The Defendant then saw Brown "make a quick and sudden movement" into the living room area, moving from right to left angled towards the Defendant and the other officers. (*Id.* ¶ 65). Brown was crouched with his shoulders shrugged, with his right arm "cocked back" in such a manner that the Defendant could not see it. (*Id.*). This led the Defendant to believe that Brown had a firearm in his right hand. (*Id.*). In a matter of seconds, the Defendant fired his weapon one time at Brown. (*Id.* ¶¶ 65, 67). Based on his knowledge, training, and experience, the Defendant believed that Brown's quick movement, body position, and body language indicated that he had a firearm and was going to shoot towards the officers. (*Id.* ¶¶ 68-69). Brown died as a result of a gunshot wound to his neck. (Compl. ¶¶ 13-14). The Defendant was not criminally prosecuted for his use of force. (Def.'s Statement of Undisputed Material Facts ¶ 75).

The Plaintiff filed the present action on August 18, 2023 against the Defendant in his individual capacity asserting claims for excessive force, in violation of 42 U.S.C. § 1983 (Count One); assault and battery (Count Two); wrongful death (Count Three); and, alternatively, negligence or gross negligence. (Compl. ¶¶ 20-70). She seeks a total of 30 million dollars in compensatory damages, 1 million dollars in punitive damages, special damages, and attorney's fees. (*Id.* at 17).

## II.  Legal Standards

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). The court should view the evidence and draw any inferences in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

Despite the Defendant's lack of opposition, the Court "cannot base the entry of summary judgment on the mere fact that the motion [i]s unopposed, but, rather, must consider the merits of the motion." *United States v. 5800 74th Ave.*, 363 F.3d 1099, 1101 (11th Cir. 2004). In considering the merits, the Court "need not sua sponte review all of the evidentiary materials on file at the time the motion is granted, but must ensure that the motion itself is supported by evidentiary materials." *Id.*

## III. Discussion

The Defendant raises a few challenges to the Plaintiff's claims against him, but the Court need only address his assertions that qualified immunity bars the Plaintiff's § 1983 claim and official immunity bars her state law claims. (Def.'s Mot. for Summ. J., at 4-18).

### A.  Qualified Immunity

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018) (quotation marks omitted). "A defendant who asserts qualified immunity has the initial burden of showing he was acting within the scope of his discretionary authority when he took the allegedly unconstitutional action." *Id.* at 1297. Once that is shown (and it is not challenged here), "the burden shifts to the plaintiff to establish that qualified immunity is not appropriate by showing that (1) the facts alleged make out a violation of a constitutional right and (2) the constitutional right at issue was clearly established at the time of the alleged misconduct." *Id.* The Court has discretion to decide these issues in either order depending on the circumstances, but the Plaintiff must demonstrate both prongs to survive a qualified immunity defense. *See Gaines v. Wardynski*, 871 F.3d 1203, 1208

(11th Cir. 2017).

As an initial matter, by failing to oppose the Defendant's Motion for Summary Judgment, the Plaintiff has not challenged the Defendant's assertion that he was acting within the scope of his discretionary authority when he shot Brown. Thus, the burden shifts to the Plaintiff to demonstrate that the facts alleged make out a violation of a clearly established constitutional right. *See Gates*, 884 F.3d at 1297. However, the Court is obligated to ensure that the motion is supported by the record evidence prior to granting it. *See 5800 74th Ave.*, 363 F.3d at 1101. Thus, out of an abundance of caution, the Court will analyze whether the evidence establishes a violation of Brown's clearly established constitutional rights with regard to Count One, the § 1983 claim.

"When evaluating an excessive force claim, courts analyze the particular facts of each case to determine whether the force used was justified under the totality of the circumstances." *German v. Sosa*, 399 F. App'x 554, 556 (11th Cir. 2010) (quotation marks omitted). This "objective reasonableness" standard takes into consideration "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 557 (quotation marks omitted). The inquiry also acknowledges that police officers "are often forced to make split-second judgments about the need for

8

such force in circumstances that are tense, uncertain, and rapidly evolving." *Piazza v. Jefferson Cnty., Ala.*, 923 F.3d 947, 953 (11th Cir. 2019) (citation modified). To that end, the Supreme Court has held that the use of deadly force is not unconstitutional when used to prevent a suspect's escape "where the officer has probable cause to believe that the suspect poses a threat of serious physical injury, either to the officer or to others." *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). But for qualified immunity to apply, "an officer need not have actual probable cause but only arguable probable cause, i.e., the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed." *Id.* (citation modified).

The Plaintiff contends that the Defendant violated Brown's Fourth Amendment rights by using "objectively unreasonable, excessive, shocking and conscious physical force" and "deadly force" against him. (Compl. ¶¶ 30-31). She further alleges that the Defendant did so "willfully, maliciously, in bad faith, and in reckless disregard" for Brown's constitutional rights. (*Id.* ¶ 32). Viewed in the light most favorable to the Plaintiff, the evidence shows that the Defendant had strong reason to believe that Brown was armed inside the apartment based on his grandmother's statements, the NCIC warning on his warrant, and the female occupants' statements that he had a weapon inside the apartment. (Def.'s Statement of Material Fact ¶¶ 6-10, 16, 35). After

announcing their presence multiple times, wearing clearly identifying insignia, Brown refused to exit the apartment and surrender to the officers. (*Id.* ¶¶ 22-28). Even after Brown looked around the corner and saw the officers, and the officers continued to call for him to come out, Brown did not surrender and instead paced the apartment and rummaged through a closet. (*Id.* ¶¶ 42-44, 47-53, 59-63). And when Brown did emerge again, he quickly moved towards the officers in a crouched position with his right hand "cocked back" and out of sight. (*Id.* ¶¶ 65-67). Under the totality of these circumstances, the Defendant's firing of a single shot at Brown was objectively reasonable. *See German*, 399 F. App'x at 556. The Defendant had a credible belief that Brown was armed based on his statements to two people close to him and his actions of rummaging through the closet knowing that officers were waiting outside for him to surrender. Given those facts and the limited defensive viewpoint of the Defendant's position, the Defendant had a justified belief that his and his fellow officers' safety was in danger when Brown started moving towards them. *Id.* at 557 (noting that the objective reasonableness standard considers "whether the suspect poses an immediate threat to the safety of the officers or others"). This conclusion is buttressed by the fact that Brown had been resisting the officers' commands for at least ten minutes, leading the Defendant to believe Brown was unlikely to surrender. *Id.* (noting that the objective reasonableness inquiry also considers whether the suspect is actively

10

resisting or attempting to evade arrest); (Def.'s Statement of Material Facts ¶ 28). In light of these facts, the Defendant's split-second decision to fire once at Brown as Brown moved towards him and his fellow officers in an offensive position was objectively reasonable. *See Piazza*, 923 F.3d at 953. It makes no difference that Brown turned out to be unarmed after the fact; all that matters is that the Defendant had arguable probable cause to believe he was armed and that he posed a threat of serious physical injury to the officers. *Montoute*, 114 F.3d at 184. While the Court is sympathetic to the Plaintiff having tragically lost her son as a result of the Defendant's action, the Defendant is clearly entitled to qualified immunity under the facts before the Court. For these reasons, the Plaintiff has failed to carry her burden of establishing a violation of Brown's Fourth Amendment rights. *Gates*, 884 F.3d at 1297. It follows that she has necessarily failed to establish the violation of clearly established law, too: "[I]f a defendant has not violated the law at all, he certainly has not violated clearly established law." *Rodriguez v. Farrell*, 280 F.3d 1341, 1345 (11th Cir. 2002). Accordingly, the Court will grant the Defendant's Motion for Summary Judgment as to the Plaintiff's § 1983 claim.

### B. Official Immunity

The Georgia Constitution provides state officials with official immunity for their discretionary actions unless they acted "with actual malice or with actual intent to cause injury in the performance of their official functions." Ga.

Const. Art. I, § 2, ¶ IX(d). The actual malice standard is a demanding one that "requires an officer to act with a deliberate intention to do a wrongful act[;]" unreasonable or even recklessly illegal conduct does not support such an inference. *Black v. Wigington*, 811 F.3d 1259, 1266 (11th Cir. 2016). Georgia law gives officers the authority to use

> deadly force to apprehend a suspected felon only when the officer reasonably believes that the suspect possesses a deadly weapon or any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury; when the officer reasonably believes that the suspect poses an immediate threat of physical violence to the officer or others; or when there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm.

O.C.G.A. § 17-4-20(b).

The Plaintiff alleges that the Defendant intentionally used deadly force against Brown in an objectively unreasonable manner and that, at the time the Defendant used said force, Brown did not pose "any threat or harm to any law enforcement officers or others." (Compl. ¶¶ 46-50). She alleges that this action, "undertaken in bad faith and with actual malice," constituted an assault and battery on Brown. (*Id.* ¶¶ 51-55). The Plaintiff further alleges that this assault and battery resulted in Brown's wrongful death, or in the alternative, that the Defendant's actions constituted gross negligence resulting in Brown's death. (*Id.* ¶¶ 57-62).

The Defendant is entitled to official immunity on all of the Plaintiff's state law claims. Again, the Plaintiff has not challenged the Defendant's assertion that his decision to use deadly force was a discretionary one. The Defendant was permitted to use deadly force under O.C.G.A. § 17-4-20(b) because he reasonably believed that Brown possessed a firearm based on the grandmother's and female occupants' statements and that Brown threatened physical violence against the Defendant and the other officers by quickly moving towards him in a crouched position rather than surrendering with his hands up. The Plaintiff's allegations that the Defendant fired his weapon at Brown with actual malice is not enough to stave off the application of official immunity because the Plaintiff must demonstrate that the Defendant acted with the intent to commit a wrongful act. As explained previously, under the facts presented to the Court, the Defendant's use of deadly force was not unreasonable, let alone wrongful. *See Black*, 811 F.3d at 1266. The Defendant is thus entitled to official immunity on the Plaintiff's state law assault and battery, wrongful death, and negligence claims, so the Court will grant the Defendant's Motion for Summary Judgment as to these claims.

### C. Damages and Attorney's Fees

"A prerequisite to any award of attorney fees under OCGA § 13-6-11 is the award of damages or other relief on the underlying claim. Similarly, punitive damages under OCGA § 51-12-5.1 cannot be awarded where no actual

damages are awarded." *Morris v. Pugmire Lincoln Mercury, Inc.*, 283 Ga. App. 238, 241 (2007) (quotation marks and citations omitted). Likewise, only prevailing parties are entitled to attorney's fees in § 1983 actions. 42 U.S.C. § 1988(b). And punitive damages are only available in § 1983 actions for conduct that constitutes a "reckless or callous disregard for the plaintiff's rights" or an intentional violation of federal law. *Smith v. Wade*, 461 U.S. 30, 51 (1983). The Plaintiff failed to demonstrate such conduct here. Because the Court is dismissing the entirety of the Plaintiff's merits claims, her attorney's fees and punitive damages claims necessarily fail as well.

## IV. Conclusion

For the foregoing reasons, the Defendant David Hidalgo's Motion for Summary Judgment [Doc. 27] is GRANTED. The Clerk is directed to enter judgment in the Defendant's favor, and to close the case.

SO ORDERED, this ____19th____ day of November, 2025.

THOMAS W. THRASH, JR.
United States District Judge

14